IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CRIMINAL ACTION |
| v. : | |
| : | 13-39-02, 03, 04 & 05 |
| MICHAEL LOWRY, : | |
| ROBERT MULGREW, : | |
| WILLIE SINGLETARY and : | |
| THOMASINE TYNES : | |

OPINION

**Stengel, J.**                                                              **November 6, 2014**

Four former Philadelphia Traffic Court Judges filed motions for judgment of acquittal or for a new trial. On July 23, 2014, a jury convicted Michael Lowry, Robert Mulgrew and Thomasine Tynes of making false declarations before the grand jury in violation of 18 U.S.C. § 1623. The same jury convicted Willie Singletary of making false statements to the FBI in violation of 18 U.S.C. § 1001. I will deny the motions.

**I.      Background**

The defendants are former Judges of the Philadelphia Traffic Court, elected to these positions by the citizens of Philadelphia. They adjudicated traffic citations issued by police for moving violations within the City of Philadelphia. Their court was very busy, with each judge adjudicating approximately 20,000 citations in a given year. The violations handled by Traffic Court yielded several million dollars each year in fines and costs which was significant revenue to the City and Commonwealth of Pennsylvania. Mr. Lowry served on the Traffic Court for five years from 2008 to 2013; Mr. Mulgrew four

years, from 2008 to 2012; Ms. Tynes 23 years, from 1989 to 2012; and Mr. Singletary four years, from 2008 to 2012.

During the eight week trial the government presented in excess of 60 witnesses and many exhibits. Witnesses included Traffic Court employees, judicial assistants (known as "personals") for each of the defendant judges, persons who were issued traffic tickets and persons who requested special treatment or "consideration" from the judges or their assistants. The evidence at trial demonstrated very clearly that defendants were influenced by "extrajudicial communications" when reaching their decisions on select tickets. In short, they and their colleagues were "fixing tickets."

The extrajudicial communications were ferried about the courthouse by the defendants' personal assistants and other court house staff. These employees testified that there was no specific term used to identify the requests. The employees would speak in code, asking for "consideration," requesting another judge to "take a look at a ticket," or simply telling a colleague or staffer, "I have a name for you." Regardless of the terms, the evidence was clear: the defendants were routinely granting favorable dispositions to well-connected ticket-holders who knew a Traffic Court judge or an employee.

The government's theory at trial was that defendants committed mail fraud or wire fraud, depriving the City and Commonwealth of fines and fees that would have been due had defendants adjudicated the tickets guilty on the merits of each case, instead of not guilty because of some personal contact, personal relationship or on a request for

consideration.[1] To prove mail and wire fraud, the government had to prove the defendants intended to deprive Philadelphia and Pennsylvania of money or property, i.e. fines that would have been due but for the "fixed" result in a given case. The jury acquitted all seven defendants of the fraud charges.[2] The jury found that Mr. Lowry, Mr. Mulgrew, Ms. Tynes and Mr. Singletary lied to the grand jury or to FBI investigators and returned a guilty verdict on the perjury counts. These motions for judgment of acquittal and new trial followed.

## II. Standard of Review

My ability to review a jury verdict is very limited. When a convicted defendant moves for acquittal pursuant to Rule 29, the defendant carries a very heavy burden and the trial court must give great deference to a jury's verdict. United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir. 1995); *see also* United States v. Rosario, 118 F.3d 160, 162–63 (3d Cir. 1997). In evaluating a motion challenging the sufficiency of the evidence at trial, I "must determine whether a reasonable jury believing the government's evidence could find beyond a reasonable doubt that the government proved all the elements of the offenses." United States v. Salmon, 944 F.2d 1106, 1113 (3d Cir. 1991); *see also* United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005). Accordingly, I must "sustain the verdict if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision." United States v. Gambone, 314 F.3d 163,

---

[1] The indictment also charged defendants with conspiracy to commit mail fraud and wire fraud.

[2] In addition to the moving defendants, the government also charged former Traffic Court Judge Michael Sullivan, Magisterial District Judge Mark Bruno and Chinatown businessman Robert Moy with mail fraud, wire fraud and conspiracy. The government did not charge these defendants with making false statements to the grand jury or FBI agents.

169–70 (3d Cir. 2003). A court may find that the government introduced insufficient evidence to support a conviction only where "the prosecution's failure is clear." <u>United States v. Leon</u>, 739 F.2d 885, 891 (3d Cir. 1984) (quoting <u>Burks v. United States</u>, 437 U.S. 1, 17 (1978)).

Under Rule 33(a), "[a] district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted." <u>United States v. Johnson</u>, 302 F.3d 139, 150 (3d Cir. 2002). Unlike a motion for insufficiency of the evidence under Rule 29, in which I view the evidence in the light most favorable to the government, a Rule 33 motion permits me to exercise my own judgment in assessing the government's case. <u>United States v. Brennan</u>, 326 F.3d 176, 189 (3d Cir. 2003). Our Court of Appeals has emphasized that motions for a new trial based upon weight of the evidence contentions are not favored and should only be granted sparingly in exceptional cases. <u>Government of the Virgin Islands v. Derricks</u>, 810 F.2d 50, 55 (3d Cir. 1987).

### III.  Discussion

#### A.  The Elements of the Offenses and the Government's Burden of Proof

To obtain a conviction for false statements to a grand jury, i.e. perjury, the government must prove: 1) the defendant testified before a grand jury under oath, 2) the defendant made a false statement, 3) the defendant knew the statement was false and 4) the false statement was material to the grand jury's investigation. 18 U.S.C. § 1623; <u>United States v. Dobson</u>, 380 F. App'x 170, 178 (3d Cir. 2010). The proof required for

4

Mr. Singletary's conviction for false statements to the FBI is similar. The government must prove: 1) the defendant made a false statement to the FBI, 2) the defendant knew the statement was false, 3) the statement was made in a matter within the jurisdiction of the FBI and 4) the statement was material to the FBI's investigation. 18 U.S.C. § 1001; United States v. Castro, 704 F.3d 125, 139 (3d Cir. 2013). Each of the four defendants dispute that a reasonable jury could find their statements to be knowingly false and material.

### B. Michael Lowry's Motion for Judgment of Acquittal and for a New Trial

Mr. Lowry testified under oath to the grand jury. The Assistant U.S. Attorney asked him, "Your testimony is you don't give out special favors is that right?" Mr. Lowry responded, "No, I treat everybody in that courtroom the same." The trial jury found that this testimony was in fact a false statement to the grand jury and returned a guilty verdict on count 69 of the indictment. Mr. Lowry contends the question was vague and argues there was insufficient evidence that he treated ticket-holders differently.

According to Mr. Lowry, the question put to him in the grand jury was too vague and ambiguous. He could not possibly have knowingly given false testimony to the grand jury because, legally speaking, a vague and ambiguous question cannot be the basis for a perjury conviction. He is right on the law and wrong on the facts. The Third Circuit has held that an excessively vague or fundamentally ambiguous question may not form the basis of a perjury conviction. United States v. Ryan, 828 F.2d 1010, 1015 (3d Cir. 1987) (citing United States v. Lighte, 782 F.2d 367, 375 (2d Cir. 1986); United States v. Slawik, 548 F.2d 75, 86 (3d Cir. 1977)), *abrogated on other grounds by*, United States v. Wells,

5

519 U.S. 482 (1997). A question is fundamentally ambiguous "when it [is] entirely unreasonable to expect that the defendant understood the question posed to him." United States v. Reilly, 33 F.3d 1396, 1416 (3d Cir. 1994) (citing Ryan, 828 F.2d at 1015). Otherwise, it is for the trial jury to resolve, "which construction the defendant placed on the question." United States v. Serafini, 167 F.3d 812, 820 (3d Cir. 1999) (citing Ryan, 828 F.2d at 1015). According to Mr. Lowry's brief, the term "special favors" is confusing because the prosecutors used the terms "consideration," "preferential treatment," "special treatment," "favorable disposition" and "special favors" interchangeably throughout the course of the grand jury examination. The question is not whether these terms were confusing, although they most certainly were not. The question is whether it is entirely unreasonable to expect that the defendant understood the question posed to him.

    The language that Mr. Lowry now chooses to parse was used in a certain context. *See* United States v. Fernandez, 389 F. App'x 194, 198 (3d Cir. 2010) ("It is clear from the context of the questions and the record as a whole that [defendant] understood what the prosecutor was asking him."). Mr. Lowry's entire grand jury examination focused on alleged ticket fixing at the Traffic Court. The prosecutors used all of these terms to ask Mr. Lowry how he disposed of cases at Traffic Court. Clearly, the prosecutors were asking Mr. Lowry whether he adjudicated tickets based on extrajudicial communications or on other factors unrelated to the merits of the case. The terms they used were simple, direct and capable of being understood by anyone with a basic working knowledge of the English language. The plain meaning of these terms would have been evident to anyone

6

with a high school education. Mr. Lowry was an elected judge. These terms were not presented as part of a vocabulary test or used in a manner that would be confusing to the average person possessed of some common sense. But, we need not belabor the plain meaning of these terms. In truth, these terms were used in a specific context and Mr. Lowry well understood that context. These words were used in the context of an inquiry about the practice of fixing tickets in Philadelphia's Traffic Court. To anyone with even a basic understanding of the long-standing and pervasive corruption in that court, such as, for example, Mr. Lowry, these terms would have made perfect sense. Mr. Lowry well understood the import of the question which formed the basis of his conviction.

Mr. Lowry's response, i.e. that he treated everyone fairly, demonstrates that he knew exactly what the prosecutor was asking. *See* United States v. Neff, 212 F.2d 297, 311 (3d Cir. 1954) ("[T]he record of the defendant's testimony before the grand jury on which Counts 2 and 3 were premised clearly demonstrates that the questions put to her and her answers thereto dealt with but one subject matter."). Why, in this context, would he claim to treat "everyone fairly" unless there was some question about his sense of fairness or about the inconsistent sense of fairness throughout the court on which he served? By answering a question about "special treatment" or "consideration" with a claim that he treated "everyone fairly" he acknowledged that there was a concern about whether he was fair or whether he was, from time to time, responsive more to influence than to fairness. In answering the question in this way, he did not tell the truth to the grand jury.

7

These were arguments best made to the jury, not to the Court after the jury has spoken. All this evidence was considered by the jury. The clarity of the terms, the context for the questions and the veracity of the answer – these were all questions presented to the jury. There is no basis to second guess or overturn the legitimate and evidence-based finding of the jury.

Second, Mr. Lowry maintains the government did not prove his statement was actually false. While Mr. Lowry seems to agree that testimony at trial proved he participated in the consideration process, he denies that he treated those ticket-holders any differently. Def. Lowry's Reply 3. The government, he insists, did not produce any evidence that ticket-holders who requested consideration received more favorable dispositions.

Yet, there is ample evidence that "connected" ticket-holders frequently did very well in former Judge Lowry's courtroom. Kevin O'Donnell, Mr. Lowry's personal assistant, and Walter Smaczylo, Mr. Lowry's court officer, testified that ticket-holders who appeared before Mr. Lowry received better outcomes if someone had requested "consideration" for them. These witnesses were in Traffic Court nearly every day when Mr. Lowry was on the bench. They were in a very good position to observe the effect requests for consideration had on the judicial process.

In an effort to explain away the damaging evidence, Mr. Lowry contends that Mr. O'Donnell's and Mr. Smaczylo's testimony was "too general" to prove beyond a reasonable doubt that he treated certain ticket-holders more favorably. There are a number of problems with this desperate argument. First, no one sitting in the courtroom

8

and listening to Mr. O'Donnell and Mr. Smaczylo testify could describe their testimony as "too general." They were clear and they were credible when they each told the jury that Mr. Lowry responded regularly to requests for consideration and special treatment by adjudicating certain cases in favor of those requests. Second, I am required to view the trial evidence in the light most favorable to the government as the verdict winner for purposes of this post trial motion. By that standard, Mr. Lowry's argument borders on frivolous. Third, this was an issue for the jury. The jury heard the questions put to Mr. Lowry before the grand jury, they heard his answer, they heard Mr. O'Donnell and Mr. Smaczylo testify and they were in the best possible position to place Mr. Lowry's statement to the grand jury in the correct context.

Fourth, Mr. O'Donnell's and Mr. Smaczylo's testimony was corroborated many times over. Court employees testified that Mr. Lowry both accepted requests for consideration and made such requests to the other judges. Perhaps the strongest evidence was Mr. O'Donnell's testimony that Mr. Lowry requested consideration for his nephew, Francis Lowry. Francis Lowry testified that he did not go to court to defend his traffic citation. Nonetheless, the government established that Former Traffic Court Judge Michael Sullivan found Francis Lowry not guilty. The jury could reasonably infer from this evidence that Mr. Lowry was expecting a favorable disposition for his nephew and that he took steps to get that disposition. Furthermore, the jury heard from four ticket-holders who requested consideration and who received a favorable disposition from Mr. Lowry. This was strong and clear evidence from which the jury could reasonably infer

that Mr. Lowry favorably disposed of these tickets in response to requests for consideration.

Mr. Lowry insists that the statistical evidence he and his co-defendants introduced proves he did not treat certain ticket-holders more favorably. In effect, Mr. Lowry wants me to find that this statistical evidence outweighs the testimony of Mr. O'Donnell, Mr. Smaczylo and Francis Lowry and the rest of the government's case. All this was presented to the jury and the trial judge has no business weighing the relative strength or quality of the evidence in the context of a motion for judgment of acquittal. *See* United States v. Flores, 454 F.3d 149, 154 (3d Cir. 2006) ("[A] court "must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury."). The statistics may well demonstrate that Mr. Lowry was a lenient judge. But the government, through cross examination, very effectively pointed out how the data could have been manipulated in Mr. Lowry's favor. The statistical evidence was presented in a methodical and careful way to the jury. Mr. Lowry's defense attorney, and all the defense attorneys, argued the persuasive value of the statistical evidence in great detail and with great enthusiasm in their eloquent closing arguments. In the end, it was for the jury to weigh the credibility of the government's evidence, Mr. Lowry's statistics and all the other evidence in this case. I will not disturb the jury's findings.

In the alternative, Mr. Lowry moves for a new trial. He advances no specific theory as to how the jury's verdict is contrary to the weight of the evidence. Again, there was ample, if not overwhelming, evidence that Mr. Lowry received requests for

consideration. His disposition of the tickets in evidence at trial supports the jury's finding that he treated ticket-holders with requests for consideration more favorably. At the grand jury, Mr. Lowry stated under oath that "[he] treat[ed] everybody in that courtroom the same." The jury found that to be a false statement. The jury's verdict is sound and based on strong and clear evidence.

### C. Robert Mulgrew's Motion for Judgment of Acquittal

On February 4, 2011, Robert Mulgrew also testified under oath in front of the grand jury. Count 70 charged that Mr. Mulgrew gave false testimony when he stated:

> Q: How about your personal, has your personal received any calls like that from other judges, other ward leaders that she's conveyed to you saying that so and so has called about this case?
>
> A. If she did, she didn't convey them to me.
>
> …
>
> Q. Let me make sure as well that if I got your testimony correct. You're saying that if other people whether they be political leaders, friends and family, anybody is approaching your personal and asking her specifically to look out for a case, see what she can do in a case, give preferential treatment, however you want to phrase it, that she is not relaying any of that information to you; is that correct?
>
> A. No, she isn't.

The jury found that Mr. Mulgrew's testimony before the grand jury was false and convicted Mr. Mulgrew of perjury. Mr. Mulgrew believes his statement was neither material nor false and seeks a judgment of acquittal here.

11

Mr. Mulgrew claims that his statements regarding the consideration process were immaterial to the grand jury's investigation into mail and wire fraud at Traffic Court. Mr. Mulgrew provides no further explanation, no doubt because it would be difficult to explain, or defend, this argument. The grand jury was considering fraudulent activity in Traffic Court related to fixing tickets through extrajudicial communications. Far from "immaterial," Mr. Mulgrew's receipt of requests for consideration was highly material and relevant to the grand jury's inquiry. Reilly, 33 F.3d 1396, 1419 (3d Cir. 1994) ("It is well established that a perjurious statement is material ... if it has a tendency to influence, impede, or hamper the grand jury from pursuing its investigation.").

Mr. Mulgrew also attacks the consistency of the verdict. Since the jury acquitted Mr. Mulgrew of the underlying fraud and conspiracy charges, he asserts that there was no evidence that his statements were false. This argument assumes that the jury acquitted Mr. Mulgrew of fraud because the jury did not believe that he engaged in the consideration process. To the contrary, the jury might have decided that the government's proof that Mr. Mulgrew made and honored requests for consideration was credible, but that he lacked the requisite intent to deprive the City and Commonwealth of money or property. See United States v. Gugliaro, 501 F.2d 68, 71 (2d Cir. 1974) ("While the meetings with another conspirator were clearly sufficiently material by any test to sustain a perjury indictment and conviction if Gugliaro had falsely denied them, a rational jury could find that they were, standing alone, insufficient to demonstrate participation with knowledge and the requisite intent in a single conspiracy.").

We do not know exactly what evidence the jury considered important. Nor do we know why the jury found Mr. Mulgrew not guilty of mail fraud and wire fraud. We do, however, know with great certainty that the jury had ample evidence to find Mr. Mulgrew lied to the grand jury. Gloria McNasby, Mr. Mulgrew's personal assistant, testified at trial that Mr. Mulgrew told Ms. McNasby that she would be getting names from other Judge's personal assistants. According to Ms. McNasby, Mr. Mulgrew instructed her to give the names to him. Contrasting Ms. McNasby's testimony with Mr. Mulgrew's sworn statement to the grand jury, the jury had substantial evidence to find Mr. Mulgrew guilty of making false statements to the grand jury.

Finally, Mr. Mulgrew asserts that his testimony was not false because the terms "consideration" and "preferential treatment" have different meanings. Mr. Mulgrew notes that earlier in his grand jury testimony he admitted that he received requests for consideration, but he drew a distinction when the prosecutor asked if he received requests for preferential treatment. At trial, Mr. Mulgrew's counsel repeatedly argued that the terms "consideration" and "preferential treatment" could not be conflated, despite numerous witnesses testifying that the consideration process went by many different names. The jury heard all of this testimony and argument and apparently did not believe a distinction could or should be made between the two terms. *See* Serafini, 167 F.3d at 820 (citing Ryan, 828 F.2d at 1015) ("[I]n instances of some ambiguity as to the meaning of a question, 'it is for the petit jury to decide which construction the defendant placed on the question.'"). Mr. Mulgrew cannot now escape his conviction by twisting the prosecutor's clear questioning and drawing a distinction which does not exist. *See* Serafini, 7 F. Supp.

13

2d 529, 539 (M.D. Pa. 1998) (quoting United States v. Crippen, 570 F.2d 535, 537 (5th Cir.1978)) ("The words used were to be understood in their common sense, not as they might be warped by sophistry or twisted in pilpul."), *aff'd*, 167 F.3d 812 (3d Cir. 1999).

**D.     Thomasine Tynes's Motion for Judgment of Acquittal**

On February 4, 2011, Ms. Tynes testified to the grand jury as follows:

> Q:   In all the years you've been [at Traffic Court] have you ever been asked to give favorable treatment on a case to anybody?
>
> A:   No, not favorable treatment. People basically know me. The lawyers know me. The court officers know me. I have been called a no nonsense person because I'm just not that way. I take my position serious and the cards fall where they may.
>
> …
>
> Q:   You've never taken action on a request?
>
> A:   No.

These statements formed the basis of the perjury charges against Ms. Tynes in counts 71 and 72. The jury found Ms. Tynes guilty on both counts.

Ms. Tynes maintains that she did not know the grand jury was examining ticket fixing at Traffic Court and was, therefore, incapable of lying about a material element of the investigation. The test for materiality is whether the statement had "a tendency to influence, impede, or hamper the grand jury from pursuing its investigation." Reilly, 33 F.3d 1396, 1419 (3d Cir.1994) (quoting United States v. Lardieri, 497 F.2d 317, 319 (3d Cir.1974)). In other words, the issue is whether the grand jury thought the testimony was material, not whether Ms. Tynes knew it was material. The government must prove Ms.

14

Tynes knew her statement was false, but it is not required to prove that she knew the statement was material. *See* United States v. Dunnigan, 507 U.S. 87, 94 (1993) ("A witness testifying under oath or affirmation violates this statute if she gives false testimony concerning a material matter with the willful intent to provide false testimony…."). Ms. Tynes's recollection of the scope of the grand jury's inquiry is not persuasive.

It is hard to imagine that Ms. Tynes was unaware of the grand jury's purpose. Ms. Tynes might have been alerted by the prosecutors' repeated questioning about how she handled requests for consideration. It would not have been too much of a stretch for Ms. Tynes to conclude, or at least suspect, that the grand jury was looking into ticket fixing when five of her fellow judges, her former Administrative Judge, her court's Director of Records and a dozen or so former and current court employees were all questioned in front of the grand jury about ticket fixing. She might have known they were concerned about ticket fixing when the FBI raided the Traffic Court, served subpoenas and carted off computers and boxes of documents all prior to the grand jury session. Ms. Tynes probably had at least an inkling there was an investigation into ticket fixing when the FBI searched the office and home of a Chinatown businessman, Robert Moy, who regularly sent her requests for special Traffic Court treatment for his clients in memos where he addressed her as "Mom."

To be clear, Ms. Tynes well knew the purpose of the grand jury in this case. Her curious assertions that she did not know the grand jury was considering evidence of ticket fixing is untethered to the basic facts of this case. Ms. Tynes should have known that

denying she gave certain ticket-holders favorable treatment was material. And even if she did not know the issue was an important or a "material" one, she well knew her statements were false. There is no question that her statements were material to the grand jury.

Ms. Tynes's bald and unsupported claim that the evidence is "insufficient" does not satisfy her very heavy burden for this Rule 29 motion. Coyle, 63 F.3d at 1243. There is no dispute that Ms. Tynes gave the testimony as alleged in the indictment. The jury heard from Ms. Tynes's personal assistant Migdalia Warren, who stated that she gave Ms. Tynes requests for consideration which Ms. Warren received from other Traffic Court staff. Ms. Warren also described Ms. Tynes's close relationship with Robert Moy, whose many clients received numerous favorable adjudications in front of Ms. Tynes. Mr. Moy was so confident in his connection with Ms. Tynes that he ran newspaper advertisements guaranteeing no points on traffic citations.

The jury also heard from several ticket-holders who Ms. Tynes found not guilty. Gordon Li testified that he received a ticket for careless driving which he took to Mr. Moy. The government introduced into evidence a note from Mr. Moy to Ms. Tynes which requested "help" on Mr. Li's ticket. Osama Siam also went to Mr. Moy when he received a ticket for traveling 70 mph in a 30 mph zone. As with Mr. Li, Mr. Moy sent a letter to Ms. Tynes notifying Ms. Tynes of Mr. Moy's interest in Mr. Siam's ticket. Finally, Timothy Blong testified that he was cited for careless driving and driving without a license. Mr. Blong complained about the tickets to his friend Danielle Czerniakowski, who was employed at Traffic Court. Ms. Czerniakowski testified that Ms. Tynes was

scheduled to hear Mr. Blong's case, so Ms. Czerniakowski submitted a request for consideration to Ms. Warren. Since Ms. Tynes found all three of these ticket-holders not guilty of the cited offenses, it was fair for the jury to infer that Ms. Tynes found the men not guilty as a result of the intercessions of Mr. Moy and Ms. Czerniakowski. This evidence, when contrasted with Ms. Tynes's grand jury testimony, is more than sufficient to support the perjury conviction.

### E. Willie Singletary's Motion for Judgment of Acquittal

Mr. Singletary was convicted of making two false statements to the FBI, both federal felonies. The indictment, at count 73, alleged that Mr. Singletary told FBI Task Force Officer Stephen Snyder, "he never arranged or facilitated preferential treatment with a matter in Traffic Court." Mr. Singletary also represented to the FBI that, "he never waived any fines, reduced fines, reduced any points, or eliminated any tickets at the request of another judge or employee of the City of Philadelphia, nor through a previous arrangement prior to a court hearing." This statement was the subject of count 74. The jury found Mr. Singletary guilty on counts 73 and 74, clearly finding the statements were false.

At Mr. Singletary's trial, the government was required to prove that his statements to Officer Snyder were material. A statement is material when it has a "'natural tendency to influence' or [was] 'capable of influencing' the FBI." United States v. Moyer, 674 F.3d 192, 214 (3d Cir. 2012) (citing United States v. Gaudin, 515 U.S. 506, 509 (1995)), *cert. denied*, 133 S. Ct. 165 (2012) and *cert. denied*, 133 S. Ct. 979 (2013). The conduct is criminal because a false statement to the FBI can derail or obstruct a legitimate

17

investigation. Had the FBI believed Mr. Singletary's statements, the agency may well have refocused their investigation. Id. ("[T]he government was not required to show actual reliance on [defendant's] statements…."). This kind of obstruction would tend to hamper an investigation into corrupt conduct by Mr. Singletary and other public officials. An investigation of this nature serves a high public interest. Mr. Singletary's denial of participating in extrajudicial requests for favorable treatment was clearly material to the FBI's investigation. Id. (citing United States v. Lupton, 620 F.3d 790, 806 (7th Cir. 2010) ("When statements are aimed at misdirecting agents and their investigation, even if they miss spectacularly or stand absolutely no chance of succeeding, they satisfy the materiality requirement of 18 U.S.C. § 1001."). Mr. Singletary's statements undoubtedly were aimed at misdirecting agents and their investigation.

Mr. Singletary appears to deny there was evidence that he knew his statement was false. Mr. Singletary's motion states, "The government has failed to make out the element that the statements of the alleged conduct in counts 73 and 74 were made with the intent to deceive." Intent to deceive is not an element of the charged crime, but the government must prove that the statement was knowingly false. See Castro, 704 F.3d at 139.[3] In truth, there was very strong evidence that Mr. Singletary well knew his statements to the FBI were false. From promising his campaign contributors a "hook up" if elected to Traffic

---

[3] Castro explains: "To establish a violation of § 1001, the government [is] required to prove each of the following five elements: (1) that [the accused] made a statement or representation; (2) that the statement or representation was false; (3) that the false statement was made knowingly and willfully; (4) that the statement or representation was material; and (5) that the statement or representation was made in a matter within the jurisdiction of the federal government." 704 F.3d at 139. The government must prove that the statement was knowingly false. Id. Since no other element requires proof of intent, I will assume that Mr. Singletary means that there is insufficient evidence of falsity.

Court to throwing out tickets issued to his family members, the record is replete with evidence that Mr. Singletary arranged for and accorded preferential treatment to well-connected ticket-holders.

With respect to count 73, evidence regarding Natisha Mathis's ticket established that Mr. Singletary arranged or facilitated preferential treatment with a matter in Traffic Court. Ms. Mathis received three moving violations over two traffic stops. Ms. Mathis knew Mr. Singletary through a mutual friend, Malcom Lewis. Ms. Mathis called Mr. Singletary for help on her tickets. After the second traffic stop, she met with Mr. Singletary in his chambers at Traffic Court and gave him the tickets. Michael Sullivan adjudicated the first ticket not guilty, and Mr. Lowry dismissed the two tickets issued during the second traffic stop. The jury could very reasonably infer from this evidence that Mr. Singletary sent requests for consideration to Mr. Sullivan and Mr. Lowry for Ms. Mathis' tickets.

Evidence supporting Mr. Singletary's conviction on count 74 came in through testimony regarding the Herbert Wilcox ticket. Philadelphia police cited Mr. Wilcox for backing down a one-way street in the wrong direction. Mr. Wilcox is connected with Philadelphia City Councilwoman Jannie Blackwell. John Fenton, a member of Ms. Blackwell's staff, testified that he spoke to Tonya Hilton, Mr. Singletary's personal assistant, and requested assistance on Mr. Wilcox's ticket. Ms. Hilton testified that Mr. Wilcox's ticket was marked for consideration. As with other requests she received, Ms. Hilton noted Mr. Wilcox's hearing date on her calendar which was introduced into

evidence. Mr. Singletary found Mr. Wilcox not guilty. This is substantial evidence that Mr. Singletary waived fines at the request of an employee of the City of Philadelphia.

The jury heard testimony about the FBI investigation and specifically about questions the agents posed to Mr. Singletary. They heard testimony from the agent about Mr. Singletary's answers to the FBI questions. In a trial that stretched over eight (8) weeks, the jury heard abundant evidence about the Traffic Court and the "culture of consideration." In the context of so much information about the pervasive and long standing ticket fixing scheme in Traffic Court – in which Mr. Singletary and the other defendants were deeply involved – the jury was asked to consider the truthfulness of Mr. Singletary's answer to the FBI agent's questions. The jury found he was not honest and truthful in his responses to FBI questioning. They made this finding on substantial and credible evidence. I will not disturb the jury's decision.

## IV. Conclusion

For the foregoing reasons, I will deny defendants' motions for judgment of acquittal, and, in Mr. Lowry's case, I will deny his motion for a new trial.

An appropriate order follows.