## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL No. 13:39-02** |
| | : | |
| **MICHAEL LOWRY** | : | |
| | : | |

### DEFENDANT MICHAEL LOWRY'S SENTENCING MEMORANDUM
### AND MOTION FOR DOWNWARD VARIANCE

Defendant, Michael Lowry, by his undersigned counsel, respectfully submits this

Sentencing Memorandum. Mr. Lowry's sentencing hearing is presently scheduled for January

14, 2015 at 10:00 AM.

### I.    SUMMARY OF CONCLUSIONS

For the reasons stated below, we respectfully submit that the Court should not impose a

sentence of incarceration in this case.  Although the United States Probation Office has correctly

calculated Mr. Lowry's total guideline offense level at 14, indicating a term of incarceration

between 15 and 21 months, we respectfully submit that the application of the statutory

sentencing factors provided in 18 U.S.C. §3553(a)(2) require a downward variance to a Zone B

and offense level 10.  Thus, under U.S.S.G. §5C1.1(c)(3), and given the parsimony

considerations required by the Supreme Court as well as this Circuit,[1] we respectfully submit that

the Court should impose a sentence of probation that includes a period of home confinement.

Such a sentence is "sufficient, but not greater than necessary" to achieve the purposes of

sentencing pursuant to 18 U.S.C. §3553(a)(2).

---

[1] See Rita v. United States, 127 S. Ct. 2456 (2007); United States v. Gunter, 462 F.3d 237, 247 (3d Cir.
2006); United States v. Cooper, 437 F.3d 324 (3d Cir. 2006).

## II.   BACKGROUND

On January 29, 2013, Mr. Lowry was indicted along with five other former Judges of the Philadelphia Traffic Court (PTC) one of the PTC's administrators and two local businessmen. The defendants were charged in a 77-Count Indictment with conspiracy to commit mail and wire fraud in violation of 18 U.S.C. §1349, as well as numerous counts of mail and wire fraud relating to about 70 traffic tickets that they allegedly "fixed" during the alleged conspiracy. The conspiracy was alleged to have begun in or about June, 2008 and to have continued until September of 2011 when the FBI executed search and seizure warrants at the PTC. Four of the Judges who either testified before the grand jury or gave statements to law enforcement - Lowry, Mulgrew, Tynes and Singletary - were also charged with false statement offenses.

On July 23, 2014, after a 2-month trial, the jury returned not guilty verdicts on the conspiracy count as well as all substantive mail and wire fraud counts against all defendants. However, the jury returned guilty verdicts on the false statement counts as to the four aforementioned defendants.

Two of these defendants have been sentenced by Court. Notwithstanding their acquittal on the conspiracy and substantive mail and wire fraud counts, the government has argued for certain guideline enhancements, as well as upward departures from their guideline sentencing ranges. However, the Probation Office did not adopt the government's arguments, and the Court denied the government's motion for an upward variance as well as the defendants' motion for a downward variance. Rather, the Court imposed jail sentences that were within the guideline ranges for the false statement offenses conviction.

It is beyond question that individual defendants are entitled to individual consideration, not only by a jury at trial, but also by the Court in imposing sentence. With this principal in

2

mind, we respectfully submit that Mr. Lowry' case is sufficiently different from the previously sentenced defendants, so as to require a downward variance from his guideline offense level. Moreover, we respectfully submit that a jail sentence is not necessary to accomplish any of the sentencing goals enumerated in 18 U.S.C. §3553(a). As will be discussed in this Memorandum:

- Defendant's alleged false statement was substantially more narrow and less serious than those of the other PTC judges.

- Unlike the other PTC judges, Mr. Lowry admitted to and took responsibility for his participation in the consideration process, not only during his 10/25/11 grand jury testimony but also during the First Judicial District's Internal Investigation (the Chadwick Investigation).

- Mr. Lowry participated in the consideration process for a relatively short time period and his participation influenced only a tiny number of his adjudications, assuming *arguendo*, that it influenced any of them.

- Unlike the two defendants who have already been sentenced, Mr. Lowry has no history of unlawful or unethical conduct.

## III.  LEGAL STANDARDS

The fundamental mandate of a sentencing court is to impose the **minimum** sentence sufficient to serve the purposes of sentencing specified in 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007) (emphasis added). After *United States v. Booker*, 543 U.S. 220 (2005), sentencing courts must:  1) properly calculate the Guidelines range; 2) rule on any departure motions made under the Guidelines; and 3) exercise their discretion by choosing a sentence in light of all relevant Section 3553(a) sentencing factors, "regardless [of] whether [the chosen sentence] varies from the sentence calculated under the Guidelines." *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006); *see also Rita v. United States*, 127 S. Ct. 2456 (2007); *United States v. Cooper*, 437 F. 3d 324 (3d Cir. 2006). Therefore, the Guidelines are merely a

3

starting point for arriving at the appropriate sentence. *Gall v. United States*, 128 S. Ct. 586, 596 (2007).

After calculating the Guidelines, the Court must consider all pertinent factors set forth in Section 3553(a), with no special weight afforded the Guidelines or any other factor. *See id.* at 596-97. As noted above, the Court's "overarching statutory mandate" is to impose a sentence "sufficient, but not greater than necessary," to accomplish the four purposes of sentencing set forth in Section 3553(a)(2) – retribution, deterrence, incapacitation, and rehabilitation. *Kimbrough*, 128 S. Ct. at 570 (citing 18 U.S.C. § 3553(a)); *Rita*, 127 S. Ct. at 2467 (parsimony provision is a "requirement" of Section 3553(a)); *Gunter*, 462 F.3d at 244 n.9. In determining the sentence minimally sufficient to accomplish the purposes of sentencing, the Court must consider several factors listed in Section 3553(a) including (a) the nature and circumstances of the offense and the history and characteristics of the defendant; (b) the kinds of sentences available; (c) the Guidelines and policy statements issued by the Sentencing Commission, including the advisory guideline range; (d) the need to avoid unwarranted sentencing disparity; and (e) the need to provide restitution where applicable. 18 U.S.C. § 3553(a)(1), (a)(3), (a)(5)-(7); *Rita*, 127 S. Ct. at 2463; *Booker*, 543 U.S. at 245; *Cooper*, 437 F.3d at 329; *Gunter*, 462 F.3d at 244 & n.9. *Rita* made clear that sentencing courts are free to simply disagree with the Guidelines' recommended sentence in any particular case, and may impose a different sentence based on a contrary view of what is appropriate under Section 3553(a). *Rita*, 127 S. Ct. at 2466 ("[a]s far as the law is concerned, the judge could disregard the Guidelines . . . ."). The Court reaffirmed this principle in *Gall* and *Kimbrough*, both of which emphasized the district court's authority to impose the sentence it deems appropriate under Section 3553(a). *Gall*, 128 S. Ct. at 601-02; *Kimbrough*, 128 S. Ct. at 570.

4

The primary directive of Section 3553(a) is for sentencing courts to impose "a sentence sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph 2 of the subsection. *See Kimbrough,* 128 S.Ct. at 563. The Court, in determining a particular sentence to be imposed, shall consider:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational and vocational training, medical care, or other correctional treatment in the most effective manner.

(3) The kinds of sentences available;

(4) The kinds of sentence and the sentencing range established for—
    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . .;

(5) Any pertinent policy statement . . . issued by the Sentencing Commission . . . [that] is in effect on the date the defendant is sentenced.

(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) The need to provide restitution to any victims of the offense.

Sentencing courts must give "meaningful consideration" to all of the statutory factors in 18 U.S.C. § 3553(a). *See United States v. Cooper,* 437 F.3d 324, 329 (3d Cir. 2006). "It is not enough for a sentencing court to recite the § 3553 factors, say that counsel's arguments have been considered, and then declare a sentence." *United States v. Olhovsky,* 562 F.3d 530, 547 (3d Cir. 2009) (citation omitted). Such a "rote statement" will not suffice at sentencing if either the defendant or the prosecution raises a ground that has legal merit and a factual basis. *Cooper,* 437 F.3d at 329. (citations omitted).

01/07/2015 SL1 1336102v1 107918.00001

## IV.   DISCUSSION

### A. The Nature and Circumstances of the Offense

#### (1) Defendant's alleged false statement was substantially more narrow and less serious than those of the other PTC judges.

We respectfully submit that, for sentencing purposes, Mr. Lowry's false statement charge differs significantly from the other false statement charges. The three other former Judges were charged with essentially denying their participation in the long-standing PTC practice of exchanging names of family, friends and political supporters with the expectation that they would be given special treatment, commonly referred to as "consideration." However, Mr. Lowry's allegedly false statement to the grand jury differs substantially from the other judges' denials that the consideration process even existed. Rather, Mr. Lowry admitted to the existence of the consideration process as well as his participation in this process by both accepting and at times giving names of persons designated for consideration. However, he added his subjective belief that when consideration requestors appeared in his courtroom, he did not adjudicate their cases any differently from other traffic violators who came before him with the same or similar offenses.[2]

Moreover, Mr. Lowry's belief that he treated consideration requesters and non-consideration requesters alike was amply supported by uncontested statistical evidence offered at trial. For example, Diandra Salvatore was one of the ticket holders whose ticket was allegedly "fixed" pursuant to the alleged conspiracy. When she appeared in Judge Lowry's courtroom on November 30, 2010, however, her offense was amended to a no-point offense as were the

---

[2]   The specific question and answer at issue in Count 69 of the Indictment are as follows: Q: Your testimony is you don't give out special favors; is that right? A: No, I treat everybody in that courtroom the same. Thus, Count 69 of the Indictment only pertained to so-called incoming requests for consideration and cannot be construed to pertain to requests made to other Judges by Defendant Lowry.

6

offenses of 7 other ticket holders with the same offense (speeding). Indeed, similarly consistent adjudications by Judge Lowry were demonstrated by statistical evidence pertaining to the other four ticket holders whose names were alleged to have been submitted for consideration. *See* Indictment at Counts 5, 6, 8, 22, 23, 27, 28, 37 and 38 on which not guilty verdicts were returned by the Jury and Judge Lowry Overview 2008-2012 attached hereto as Exhibit A.[3]

Thus, we submit that Mr. Lowry's allegedly false statement is much narrower and less serious than those made by the other Defendants.

### (2) Mr. Lowry participated in the consideration process for a relatively short time period and his participation influenced only a tiny number of adjudications, assuming *arguendo* that it influenced any.

As discussed above, we respectfully submit that the government failed to prove beyond a reasonable doubt that Mr. Lowry's participation in the so-called consideration process influenced any of his adjudications. But assuming *arguendo* that it influenced some of them, it is clear that they were few and far between.

The government alleged in Count One of the Indictment that the allegedly unlawful conspiracy began on or about July 2008 and ended in September 21, 2011, when the FBI executed a search warrant at the Philadelphia Traffic Court. Thus, it is clear that former Judge Lowry, who was not sworn in until January 1, 2008, only participated in the allegedly unlawful conspiracy for slightly more than three years. It is also undisputed from PTC records that during the 2008-2011 time-period, former Judge Lowry adjudicated about 82,000 traffic tickets but was

---

[3]  It is significant that the government's 5-year investigation of the PTC leading up to trial turned up only 6 ticket holders whose tickets were allegedly influenced by Mr. Lowry's participation in the alleged conspiracy. Although, as observed by the Court in connection with Mr. Lowry's Rule 29 Motion, government witnesses O'Donnell and Smaczylo testified in general terms that a higher number of names may have been given to Mr. Lowry, they were unable to identify even a single ticket holder, date or offense that was "fixed" by Judge Lowry. Indeed, Mr. O'Donnell testified that, to the best of his recollection, Judge Lowry treated everyone leniently but evenhandedly.

7

only charged with improperly adjudicating or influencing the adjudicating of less than 10 of these tickets. *See* Indictment at Counts 5, 6, 8, 22, 23, 27, 28, 37 and 38 and Lowry Overview 2008-2012 attached as Exhibit A.   This comes out to about .00012% of the total number of traffic tickets adjudicated by Mr. Lowry during the relevant time period. Even if we were to increase this amount by tenfold to 100 tickets, the result would still be nearly infinitesimal. Although one might say that one ticket that is wrongfully or improperly adjudicated is one ticket too many, we respectfully submit that improperly adjudicating about one one-thousands of one percent of the universe of tickets, does not amount to widespread corruption on the part of the defendant, especially when nothing of value was demanded or received and the adjudications in question were largely if not totally consistent with the lenient way that Mr. Lowry adjudicated all of his cases.[4]

### B. The Nature and Characteristics of the Defendant

**(1) Unlike the other PTC judges, Mr. Lowry admitted and took responsibility for his participation in the consideration process, not only during his 10/25/11 grand jury testimony but also during the First Judicial District's Internal Investigation (the Chadwick Investigation).**

Mr. Lowry fully understands the seriousness of this offense and respects the jury's verdict.  However, the Court, in making its sentencing determination, must consider Mr. Lowry and his offense separate and apart from the other defendants in this case.

We submit that Mr. Lowry's perjury conviction is distinguishable from the other defendants' convictions.  Mr. Lowry never once denied that the consideration process existed at the PTC or that he received names of people with related consideration requests from PTC employees.  Mr. Lowry acknowledged during his grand jury testimony that he was given names

---

[4]   There is no evidence or allegation that Mr. Lowry ever accepted anything of value or otherwise benefitted as a result of the consideration process.

of people requesting consideration of their tickets by his personal assistant, Kevin O'Donnell, other Traffic Court employees and elected officials. *See e.g.* GJT, at 31:16-32:11 and 40:9-41:15. Unlike the other defendants, Mr. Lowry did not attempt to "derail" the investigation and claim that he did not know about the PTC's consideration process. He stated that he did listen to names given to him by PTC personnel but also stated that he treated those people in the same manner as everyone else who came into his courtroom.

Quite apart from Mr. Lowry's testimony before the grand jury, we respectfully submit that Mr. Lowry's cooperation with the Chadwick Investigation is a factor that the Court should consider not only in the context of the Section 3553(a) factors but also for the purpose of granting Mr. Lowry a downward departure from his sentencing guideline range.

As a result of the FBI's September 2011 raid of the PTC, the First Judicial District, after consultation with Chief Justice Ronald D. Castille, engaged Chadwick Associates, Inc. to conduct an independent review of the PTC. While Chadwick Associates identified several areas of concern in the operation of the PTC, its November 19, 2012 Report focused on the conduct of judges adjudicating cases and granting "preferential treatment to violators whose identities or connections they knew." *See Chadwick Report,* at p. 2.[5] The Chadwick investigators, interviewed 42 court employees, four Traffic Court judges and one Supreme Court justice. *See id.* at 7.

Mr. Lowry, who was a sitting Judge at the time, agreed to be interviewed and cooperated fully with the Chadwick Associates. *See id.* at p. 12. Mr. Lowry never denied that people approached him with names for consideration.[6] Mr. Lowry's full cooperation with the Chadwick

---

[5] The Chadwick Report can be found at: http://www.courts.phila.gov/reports/

[6] Mr. Lowry told the Chadwick investigators that when he started hearing cases at the PTC, "Judge DeAngelis told him that he had to participate in the practice saying, 'You have to do what you have to do, just be careful.'" *Id,* at p. 20.

9

investigation is in contrast with several other PTC Judges (both former and sitting at the time of the investigation) who either refused to be interviewed or did not cooperate with the investigation by denying or minimizing the consideration practice.[7]

During a pre-trial hearing in this case, one of the Chadwick investigators, Ms. Jessica Davis, testified about Mr. Lowry's cooperation in the Chadwick Investigation.

> Q:   Did he [Lowry] – how – did he appear willing to talk during the interview?
> A:   Yes, he did.
> Q:   Was he cooperative?
> A:   Very cooperative.
> Q:   And, in fact, at the bottom of Exhibit 3 does it reflect accurately what he said?
> A:   Yes, he was forthcoming.  He said he wasn't going to lie about anything and he was going to tell us whatever he [sic] wanted to know.  In fact, he was very forthcoming during the interview.

*Id.* at 21:6-16.  Ms. Davis further testified that Mr. Lowry was the most cooperative PTC Judge interviewed by the Chadwick Associates:

> Q:   In terms – you were present for the other judges who were interviewed?
> A:   Yes, I was.
> Q:   How would you rank his [Lowry's] cooperation in comparison to the other judges?
> A:   I would say **he was more cooperative than any of the other judges** that we interviewed.

*Id.* at 21:25-22:6.  (emphasis added).

The *Chadwick Report* notes that Judge Lowry acknowledged that the consideration practice was wrong and believed he could be an effective advocate for its abolishment.  *See Chadwick Report*, at p. 14.  It is also significant, we submit, that Mr. Lowry told the Chadwick investigators that he had sought out consideration for his nephew Francis Lowry, Jr.  Prior to Mr.

---

[7]  *See* 5/8/14 Transcript of *Kastigar* Hearing, J. Davis testimony, 20:5-11.  Judges DeAngelis, Tynes and Sullivan declined to be interviewed by the Chadwick investigators.

Lowry's statement concerning his nephew, neither the Chadwick investigators nor the federal government knew about the Francis Lowry, Jr. ticket.[8]

Mr. Lowry's interaction with the Chadwick investigators is but one "snapshot" of his overall involvement with the investigation into conduct that occurred at the PTC. We respectfully submit, however, that it is a snapshot that permits the Court more insight into Mr. Lowry's character than it otherwise has. He answered all the questions asked of him by the Chadwick investigators, and according to one such investigator, Mr. Lowry was the most cooperative Judge who was interviewed. As the Report sets forth, some PTC Judges refused to even be interviewed. By submitting to an interview and answering all of the Chadwick investigators' questions, Mr. Lowry demonstrated his willingness to speak openly and frankly about what was occurring at the PTC.

### (2) Mr. Lowry comes before the Court with no prior history of criminal or unethical behavior.

By separate letter to the Court we are submitting various letters from family, friends and members of the community attesting to Mr. Lowry's good character.

Michael is 60 years old. Prior to the instant offense, he has no criminal record and no history of dishonest or unethical conduct. He has three brothers and two sisters and was born and raised in the Mayfair neighborhood of Philadelphia. He graduated from Lincoln High School in Northeast Philadelphia in 1974.

After high school and until 1979, Mr. Lowry worked in a printing company on Arch Street as a type setter. He then spent a year working as a cashier in the PTC. From 1981 to

---

[8]   Kevin O'Donnell, Lowry's personal, made no mention of the Francis Lowry. Jr. ticket to Chadwick Associates or to the prosecutor during his first grand jury testimony. It was only after the *Chadwick Report* was published in the *Philadelphia Inquirer* that Mr. O'Donnell read about Mr. Lowry's statement concerning Francis Lowry, Jr. and testified about the ticket in his second grand jury appearance. Therefore, it is more than likely that the federal government would not have even known about the Francis Lowry, Jr. ticket if Michael Lowry had not voluntarily told the Chadwick investigators about it.

11

1991, he worked at an auto parts after-market warehouse. He began as a stock boy and worked his way up to warehouse manager before the company went out of business. After that business closed, Mr. Lowry started his own business called Mayfair Appliances where he sold, rebuilt and repaired a wide variety of appliances. He ran this business until 2001. He then became employed by the Court of Common Pleas of Philadelphia County as a personal to a Common Pleas Court Judge from 2001 to 2004. From 2004 to 2008, Mr. Lowry was employed by Pennsylvania State Senator Michael McGeehan and performed primarily constituent services. Mr. Lowry ran for Traffic Court Judge in 2007 and took the bench in January 2008. He was suspended from the PTC without pay on January 29, 2013.

   Mr. Lowry has a very close relationship with his family. Michael's father died in 2006. Michael moved in with his mother Anna Lowry, who is 87 years old, in June 2013, in order to take care of her. Anna Lowry can no longer live alone in her house in Mayfair and requires a great deal of assistance. She uses a walker and is unable to climb up stairs. Michael had a chair lift installed so his mother can get up and down the stairs in the home. He does all the cooking and cleaning in the home and drives his mother everywhere she needs to go, including doctor's appointments. Michael picks up all of her medications and sorts them for her so she knows which ones to take at different times each day.[9]

   In or near September 2014, Michael's brother Jimmy, who is 56 years old, also moved in with Michael and Mrs. Lowry after suffering a stroke. He worked as a Teamster but is now on

---

[9] Anna Lowry is currently taking several medications including 1) carafate (anti-ulcer medication); Cardizem (hypertension); Norco (pain medication); Crestor (cholesterol); Furosemide (fluid build-up and swelling caused by congestive heart failure, liver cirrhosis, or kidney disease; and Nexium (acid reflux); and Aspirin (blood thiner)

disability. Jimmy currently continues to suffer from seizures[10] and also relies on Michael's assistance.

Since his removal from the Philadelphia Traffic Court, Michael has been unemployed. He will most likely lose his pension as a result of his conviction. He was also recently diagnosed with melanoma on his face for which he has undergone surgery. Because he was a PTC Judge for less than five years, he is not eligible to receive medical benefits as part of his pension. Therefore, he has no health insurance.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

An appropriate and just sentence must reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense conduct. In *Gall v. United States*, 552 U.S. 38, 44 (2007), the Supreme Court held that a non-incarceration sentence still represents "substantial restriction[s] on freedom" and are punitive in nature. A non-custodial sentence can therefore satisfy the goals of 3553(a)(2)(A). In *Gall*, the Supreme Court affirmed the district court's sentence of probation as an alternative to incarceration and explained that a sentence of probation involves strict reporting conditions, drug and alcohol testing, the inability to make decisions or changes relative to significant life issues without first obtaining permission. *See id.* We respectfully submit that a sentence of probation, along with a period of home confinement, imposed upon Mr. Lowry can accomplish the requirements of 3553(a)(2)(A).

### D. The Need to Afford Adequate Deterrence to Criminal Conduct and to Protect the Public from Further Crimes by the Defendant

---

[10]  Jimmy Lowry is currently taking medication, including levetiracetam (500 mg), to treat his seizures as well as meclizine (25 mg) for constant vertigo. He also takes metformin (850 mg) for diabetes, niacin (1000 mg), fenofibrate (145 mg) and pravastatin (40 mg) for cholesterol, lisinopril (10 mg) for high blood pressure, omeprazole (20 mg) for acid reflux and aspirin (325 mg) for blood thinner.

There is little to no risk of recidivism by Mr. Lowry. He is nearly 60 years old[11] and has no criminal history. He also has a supportive family, strong roots in the community and has always been employed. Therefore, there is no realistic need to deter Mr. Lowry from committing any further crimes or protecting the community from his future conduct.

Moreover, a sentence of incarceration does not necessarily achieve the goal of general deterrence more so than a non-custodial sentence does.

Research indicates that it is the certainty of apprehension, not an increase in the duration of long sentences, that actively deters would-be offenders. *The Growth of Incarceration in the United States: Exploring Causes and Consequences*, at p. 337, Washington, D.C.: The National Academic Press, 2014. http://www.nap.edu/openbook.php?record_id=18613.com . The National Research Council found that the deterrent value of long sentences is minimal, as the decision to commit a crime is more likely influenced by the certainty and swiftness of punishment than by the severity of the criminal sanction. *See id.* at 345. Similarly, research published by The Sentencing Project stated that "[i]f there was 100% certainty of being apprehended for committing a crime, few people would do so. But since most crimes, including serious ones, do not result in an arrest and conviction, the overall deterrent effect of the certainty of punishment is substantially reduced. Clearly, enhancing the severity of punishment will have little impact on people who do not believe they will be apprehended for their actions." *Deterrence in Criminal Justice. Evaluating Certainty vs. Severity of Punishment.* The Sentencing Project, Valerie Wright (Nov. 2010). www.sentencingproject.org/doc/deterrence%20briefing%20.pdf.

---

[11]   The National Research Council has stated that "[r]ecidivism rates decline markedly with age." *The Growth of Incaceration in the United States: Exploring Causes and Consequences*, p. 155 (2014).  www.nap.edu

Liberal organizations, however, are not the only ones recognizing the need for sentencing reform and questioning whether our country's high rate of incarceration is effective.  In early 2013, at the direction of Attorney General Eric Holder, the Department of Justice launched a review of the criminal justice system in order to identify reforms to ensure federal laws are enforced more fairly and, due to constrained budgets, more efficiently.  The DOJ dubbed this 2013 initiative *"Smart on Crime."   See Smart on Crime:  Reforming The Criminal Justice System for the 21st Century*, (August 2013) at p. 1. http://www.justice.gov/sites/default/files/ag/legacy/2013/08/12/smart-on-crime.pdf.  As part of its review, the DOJ studied all phases of the criminal justice system, including charging, sentencing, incarceration and reentry, to examine which practices were most successful at deterring crime and which were not.

Approximately one year after the DOJ published *Smart on Crime*, Attorney General Holder, speaking at the Brennan Center for Justice, discussed the DOJ initiative. *See Press Release, Attorney General Eric Holder, One Year After Launching Key Sentencing Reforms, Attorney General Holder Announces First Drop in Federal Prison Population in More Than Three Decades, Address at The Brennan Center for Justice* (September 23, 2014), http://www.justice.gov/opa/pr/one-year-after-launching-key-sentencing-reforms-attorney-general-holder-announces-first-drop-0. The Attorney General stated that while the United States population had increased by about a third since 1980, the federal prison population had grown by almost 800 percent over the same period.  He further observed that spending on corrections, incarceration, and law enforcement had exploded, "consuming $260 billion per year nationwide." *Id.*

Attorney General Holder stated:

15

> Perhaps most troubling is the fact that this astonishing rise in incarceration—
> and the escalating costs it has imposed on our country, in terms both economic
> and human—have not measurably benefitted our society. We can *all* be
> proud of the progress that's been made at reducing the crime rate over the past
> two decades – thanks to the tireless work of prosecutors and the bravery of law
> enforcement officials across America. **But statistics have shown – and all of us
> have seen—that high incarceration rates and longer-than-necessary prison
> terms *have not* played a significant role in materially improving public safety,
> reducing crime, or strengthening communities.**

*Id.* (emphasis added). "Clearly," stated Attorney General Holder, "criminal justice reform is an idea whose time has come." *Id.*

Therefore, studies have increasingly demonstrated that a period of incarceration is not a panacea as a means of general deterrence.

### E. The Need to Provide the Defendant with Needed Educational and Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.

Mr. Lowry has worked since he was a teenager.  He is not in need of any educational or vocational training, other correctional treatment or medical care provided by the Bureau of Prisons.

## V.    THE GOVERNMENT'S SENTENCING ARGUMENTS

The government argues that the Court should impose an upward variance based on the seriousness of the offense and the harm caused by Mr. Lowry that are not adequately taken into consideration in the determination of the applicable sentencing guidelines range.

In its Sentencing Memorandum, the government argues that Mr. Lowry has shown a lack of remorse for his perjury.  The government states that he has never offered an apology or "come clean" like other judges did.  Govt.'s Memo, at p. 6.  The defense objects to this argument.

16

Mr. Lowry exercised his 5th Amendment Rights to trial. The government's only explanation of Mr. Lowry failing to "come clean" is to reference Judges Hogeland and Warren taking "responsibility for their actions." *See id.* at p. 6, n.3. The Court is aware of the fact that both Judges Hogeland and Warren entered into guilty pleas with the government. If the government is arguing that Mr. Lowry has failed to show a lack of remorse or "come clean" by not entering into a guilty plea and should therefore receive an upward variance at sentencing, then that argument is highly improper. Mr. Lowry's exercising his Constitutional rights to go to trial certainly cannot be a basis for an enhanced sentence.[12]

The case law the government cites in its Sentencing Memorandum for the proposition that a lack of remorse may serve as a basis for an upward variance are not applicable to the facts of Mr. Lowry's case. The government cites to *United States v. Sucarato*, 511 Fed. Appx. 165, 2013 WL 210218 (3d Cir. Jan. 28, 2013) (non-precedential) in support of its lack of remorse argument. The *Sucarato* case, however, is a non-precedential Third Circuit opinion that fails to set forth *any* facts upon which the district court relied upon in granting an upward variance. According to the government's appellate brief, however, the defendant, the president of a New York capital management and financial consulting firm, used false representations to solicit friends and neighbors to invest in certain hedge funds and entered a guilty plea to wire fraud. Brief for Appellee at 2, *United States v. Sucarato*, (No. 12-1759) (3d Cir. July 23, 2012). According to the Probation Office's Report, the loss amount to the victims was more than $1,000,000 but less than $2,500,000. *See id.* at p.6. The district court found that the victim investors had been "emotionally ravaged" and that their lives would never be the same because they had trusted the defendant and many had given up their life assets. *See id.* at p. 16. The

---

[12] Mr. Lowry did not testify at trial, and thus, the government cannot be claiming that he obstructed justice by testifying falsely.

district court found that the way in which the defendant had lured in and preyed on his victims was of the likes he had not seen in a long time, and that the defendant's "sophistication" and "web of lies and deceit" was not captured in the advisory Guidelines range. *See id.* at p. 9. The facts of this case are obviously not on par with the facts here, in which there are no victims and Mr. Lowry is not alleged to have taken $1.00 from anyone.

The government also cites to *United States v. Ponds*, 499 Fed. Appx. 204, 2012 WL 4335969 (3d Cir. Sept. 24, 2012), another non-precedential case, in support of its lack of remorse argument for an upward variance. In *Ponds*, two Philadelphia police officers were called to a scene where the defendant had a sawed-off shotgun and was eventually convicted under 18 U.S.C. § 922(g)(1) of possession of a firearm by a convicted felon. *See id.* at 205. Two weeks prior to the incident, the defendant had been released from federal prison after serving a seven year sentence for a § 922(g)(1) conviction. *See id.* At the sentencing hearing, the government moved for an upward departure, alleging that the defendant's criminal history category was inadequate to reflect the seriousness of his past criminal conduct and his likelihood of committing future crimes. *See id.* The district court denied the motion but found that a "modest variance of five months above the guidelines range was warranted based upon the defendant's "ironclad incorrigibility and utter lack of remorse." *Id.* The Third Circuit affirmed the district court's imposition of sentence. *See id.* at 206. These facts involving a dangerous felon possessing guns are clearly not relevant to Mr. Lowry's case. Neither of the cases cited to in the government's Sentencing Memorandum serve as legal authority upon which to base an upward variance for Mr. Lowry.

The remaining allegation the government relies on in arguing for an upward variance here is contained in footnote 4 of its Memorandum which states: "After the verdict, Lowry

18

approached AUSA Denise Wolf and FBI Agent Jason Blake and inquired whether AUSA Wolf would prosecute Agent Blake for Agent Blake's 'lies' during his testimony." *See Govt.'s Memo* at p. 7, n.4. Defense counsel submits that this type of conduct is not contemplated as a basis to enhance a defendant's sentence in the advisory guidelines. It is also not supported by case law. Moreover, it is true that Special Agent Blake testified before the grand jury incorrectly, in at least two instances, involving Mr. Lowry not holding any hearing at all with respect to two tickets.[13] We respectfully submit that this conduct is not the type of conduct that the government should be using in an effort to put a criminal defendant in prison for a longer period of time. It was an unfortunate remark Mr. Lowry made in a very emotional state immediately after the verdict that came after a long trial.

Finally, the Court found that there was an insufficient basis to grant the government's motion for an upward variance as to Defendants Mulgrew and Tynes. We submit that, keeping in mind that each defendant is different, there is likewise insufficient evidence upon which to sentence Mr. Lowry above the applicable guidelines range.

## VI.    CONCLUSION

For all of the foregoing reasons, we respectfully submit that the Court should grand Mr. Lowry's Motion for a downward variance from his guideline offense level and sentence him to a period of probation with the condition that a portion of the probationary period be spent on home confinement.

---

[13]   Special Agent Blake incorrectly testified before the grand jury that Mr. Lowry held no hearing at all with respect to the citations received by Camden Iron and Richard Holmes.

01/07/2015 SL1 1336102v1 107918.00001

Respectfully submitted,


*/s/William A. DeStefano*
William A. DeStefano
Terri A. Pawelski
Stevens & Lee
1818 Market Street, 29th Floor
Philadelphia, PA 19103
(T)  215-751-1941/1961
(F)  610-371-7397

*Counsel for Defendant Michael Lowry*

20

## CERTIFICATE OF SERVICE

I hereby certify that on this date a true and correct copy of Defendant Michael Lowry's

Sentencing Memorandum and Motion for Downward Variance was electronically and served on

counsel to all parties to this criminal case by the Electronic Case Filing ("ECF") System

including the following counsel for the government.


Denise S. Wolf, Esquire
Assistant United States Attorney
United States Attorney's Office
615 Chestnut Street – 12th Floor
Philadelphia, PA  19106


Anthony J. Wzorek, Esquire
Assistant United States Attorney
United States Attorney's Office
615 Chestnut Street – 12th Floor
Philadelphia, PA  19106


*/s/ Terri A. Pawelski*
Terri A. Pawelski


Dated:  January 7, 2015

21